UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| JOHN MICHAEL EDDY and | ) | Case No.  6:12-bk-04736-CCJ |
| NANCY ELIZABETH EDDY, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| MARIE E. HENKEL, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:13-ap-00112-CCJ |
| vs. | ) | |
| | ) | |
| THE BROTHERS MILL, LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| MARIE E. HENKEL, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 6:13-ap-00115-CCJ |
| | ) | |
| FRANK RAYMOND EDDY JR., | ) | |
| NANCY ELIZABETH EDDY, | ) | |
| THOMAS L. DEAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Marie E. Henkel, the Chapter 7 Trustee (the "Chapter 7 Trustee"), appointed in this case for the joint debtors, John Michael Eddy ("Mike") and Nancy Elizabeth Eddy ("Nancy") brought two adversary proceedings which were consolidated for trial.  The first adversary arises from a

complaint against Mike's brother Frank Raymond Eddy ("Ray") as trustee, and the beneficiaries of an irrevocable trust established by Mike in 1982 (the "JME Trust Adversary"). The second adversary arises from a complaint the Chapter 7 Trustee brought against The Brothers Mill, Ltd., a limited partnership owned equally by Mike and Ray (the "Brothers Mill Adversary").

After a three day trial and upon consideration of the evidence and analysis of the law the Court makes the following Findings of Fact and Conclusions of Law.

## Introduction

Mike and Nancy are married. Mike and Ray are brothers, best friends and life-long business partners.[1] Together with his brother, Mike has had a long and successful business career spanning over 40 years. The brothers' business ventures included a home building business, a sod business, a tire business and a restaurant business. At one point, Mike and Ray owned 68 McDonalds restaurants--more than any other owner in central Florida. In 2007 Mike and Ray sold those McDonalds for $20 million. Mike and Ray owned all of these assets equally and operated all of these business ventures under the umbrella entity of The Eddy Corporation ("TEC"). When Mike and Ray established TEC each owned 20,000 shares.

Over thirty years ago, Mike created the John Michael Eddy Trust of 1982 (the "JME Trust") to which he transferred 8,000 shares of his stock in TEC. The JME Trust was established as an irrevocable trust under Florida law for the benefit of Mike's spouse and two children. The original trustee was Thomas Dean. After Dean's death, Mike appointed his brother Ray as trustee.

---

[1] Ray and his wife also filed Chapter 7 and a different trustee was appointed. That trustee brought similar actions which were consolidated for trial with these proceedings. The adversary proceedings regarding Ray settled prior to trial.

Despite their many successes, beginning in 2006, Mike and Ray suffered numerous financial setbacks both in business and personally. In 2008, Mike purchased his TEC stock from the JME Trust to use as collateral for business loans. In exchange for the stock Mike issued a promissory note to the JME Trust which at the time of trial was in the face amount of over $2 million. In 2008, TEC distributed half of its assets to Mike individually (and half to Ray) to repay shareholder loans. Mike estimated that the assets he received from TEC had a value of approximately $1.85 million. In 2010, faced with increasing debt and litigation Mike became concerned that the TEC assets which he then held individually could be reached by creditors. To protect those assets Mike and his brother established the Brothers Mill, Ltd. and transferred their respective TEC assets into the partnership. Subsequently, Mike transferred his interest in the partnership to the JME Trust as security for his $2 million note. In 2012, with financial problems steadily worsening, Mike and Nancy filed this chapter 7 case.

## The Adversary Proceedings

By the JME Trust Adversary, the Chapter 7 Trustee asserts five causes of action. Counts I and II allege that the JME Trust assets are property of the estate pursuant to Section 541 of the Bankruptcy Code and should be turned over to the Trustee pursuant to Section 542 of the Bankruptcy Code.[2] By Counts III and IV, the Chapter 7 Trustee alleges that Mike made transfers into the JME Trust which are avoidable as fraudulent pursuant to Sections 548 and 550 of the Bankruptcy Code. And by Count V, the Chapter 7 Trustee alleges that Mike made preferential transfers to the JME Trust pursuant to Sections 547 and 550 of the Code.

By the Brothers Mill Adversary, the Chapter 7 Trustee asserts four causes of action. Count I alleges that Mike's transfer of $1,228,525.57 to the Brothers Mill is a shareholder loan

---

[2] All references to the "Bankruptcy Code" or the "Code" refer to 11 U.S.C. § 101 et. seq.

due and owing to Mike and is estate property under Section 541 and subject to turnover under Section 542. By Counts II and III, the Chapter 7 Trustee alleges that Mike transferred assets into the Brothers Mill with the intent to "hinder, delay or defraud creditors" under Bankruptcy Code Sections 548 and 550. Count IV requests an injunction against the use of the Brothers Mill assets under Section 105 of the Code.

Because the facts underlying the JME Trust Adversary and the Brothers Mill Adversary are so intertwined, there is a necessary overlap in the Court's analysis. Although somewhat awkward, because of the overlap, the Court addresses Count IV of the JME Trust Adversary and Count II of the Brothers Mill Adversary together.

For the reasons set forth below, the Court determines that (i) the assets of the JME Trust are not estate property and therefore not required to be turned over under Section 542 of the Bankruptcy Code (ii) the $1,228,000 Mike transferred to Brothers Mill was a capital contribution rather than a loan and therefore not subject to turnover, and (iii) Mike's transfer of the TEC Assets to the Brothers Mill and his subsequent pledge of his partnership interest in the Brothers Mill to the JME Trust are avoidable under Section 548 and 550 of the Code.

## Findings of Fact

### The JME Trust

Since Mike established the JME Trust over thirty years ago the trustee has authorized several loans and distributions to trust beneficiaries as permitted by the trust instrument.[3] In addition, in 1986, Mike needed the 8,000 shares of TEC stock he had contributed to the JME Trust as collateral for a business loan.[4] Mike and Thomas Dean, as trustee, entered into a purchase and sale agreement under which Mike purchased the TEC shares from the JME Trust

---

[3] Trustee's Ex. No. 1.
[4] Trustee's Ex. No. 5.

for a promissory note for $979,280, with an interest rate of 7.45% a year, due in full in 2001.[5] Through two amendments, the TEC Note was ultimately restated in 2010 at $2,395,747, with a 1% interest rate, payable on demand (the "TEC Note").[6]

In 2007, after the brothers experienced financial difficulties, Ray (as trustee) and Mike executed an "authorization" which allowed the JME Trust to loan monies to Mike for living expenses payable "immediately upon receiving any funds".[7]  Since that time, the JME Trust has made three loans to Mike for $5,000 each, all which appear to have been repaid.[8]  Also, during this bankruptcy case, the JME Trust made a loan to Mike and Nancy for approximately $165,000 to purchase a home (the "Home Loan").[9]  The Home Loan is reflected by a promissory note and a mortgage payable with 6% interest.[10]

Both the TEC Note and the Home Loan remain outstanding.[11]  Mike has however, pledged the proceeds of his life insurance policy as security for the TEC Note.[12]  When he did so the policy had a face value of $3 million.  As of the time of the trial, the face amount of the policy was $1 million.[13]  In addition, upon forming and capitalizing the Brothers Mill, Mike pledged his partnership interest to the JME Trust as further security for the TEC Note.[14]  The JME Trust then executed a UCC-1 filing in 2010, finalizing the debt owed by Mike.[15]

---

[5] Trustee's Ex. No. 5.
[6] Trustee's Ex. Nos. 3 and 99.
[7] Trustee's Ex. No. 2; an identical "authorization" was executed by Mike as the trustee for Ray's trust.
[8] Trustee's Ex. No. 4.
[9] Trustee's Ex. No. 4.
[10] Trustee's Ex. Nos. 135 and 136.
[11] There is evidence that Mike repaid the JME Trust $63,500, but it is not possible based upon the record to determine whether this was in partial payment of the Home Loan or the TEC Note.
[12] Trustee's Ex. No. 7.
[13] Trustee's Ex. No. 7.
[14] Trustee's Ex. No. 43.
[15] Trustee's Ex. No. 103.

### The TEC Transaction

In 2008, Mike and Ray entered into an agreement with TEC to resolve unpaid obligations TEC owed to them and to the JME Trust (the "TEC Agreement").[16] Since TEC had no cash to repay the obligation, the TEC Agreement provided for TEC's distribution of fifty percent of its assets to Ray and Mike in equal portions.[17] As of 2010, Mike alleged those assets to have a value of approximately $3.7 million. Mike's fifty percent share of those assets had an approximate value of $1.85 million (the "TEC Assets").[18] Accordingly, for a period of time, Mike and Ray held significant assets individually.

At the end of 2006, Mike, Ray and TEC were involved in various lawsuits for monetary defaults.[19] In addition, Mike and Nancy were in default under various mortgages.[20]

### The Brothers Mill

On July 23, 2010, Mike and Ray created the Brothers Mill, and capitalized it by contributing their respective TEC Assets.[21] The limited partners of the Brothers Mill are Mike and Ray each with a 49.5% interest.[22] The general partner is a Florida limited liability company called "TBM Management, LLC" ("TBM"), in which Mike and Ray each own 50%, and representing a 1% interest in the Brothers Mill.[23]

---

[16] Trustee's Ex. No. 29.
[17] These assets consist of a combination of stock in a number of entities, various promissory notes and real property.
[18] Trustee's Ex. No. 30.
[19] Trustee's Ex. No. 22.
[20] Trustee's Ex. No. 22.
[21] Trustee's Ex. Nos. 61 and 97.
[22] Trustee's Ex. No. 97.
[23] Transcript at 241, Lines 1-19; Trustee's Ex. No. 97.

In October 2010, Mike "pledged, sold and assigned" his limited partnership interest in the Brothers Mill to the JME Trust "to induce the JME Trust to continue" the TEC Note.[24]

The Brothers Mill's tax returns and balance sheets for 2010, 2011, and 2012 reflect an outstanding shareholder loan owing to Mike for $1,228,372.60.[25]  Over the Chapter 7 Trustee's objection, the Court admitted into evidence the Debtors amended tax returns for the Brothers Mill for 2010, 2011, and 2012.  Mike amended these tax returns approximately eight days before the trial to recharacterize the amounts originally identified as shareholder loans to capital contributions.[26]

## Conclusions of Law

### *The JME Trust Adversary Proceeding*

The Chapter 7 Trustee argues that because of Mike's transactions with the JME Trust-- the TEC Note and the loans--Mike's control over Ray, and Ray's failure to follow the strict terms of the trust instrument--the irrevocable nature of the JME Trust has been destroyed and the trust's assets should be turned over to her under Section 542 of the Code.

Section 542 (a) of the Code provides that "...an entity ..., in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under Section 363 of this title ..., shall deliver to the trustee, and account for, such property or the value of such property...".

It is the Chapter 7 Trustee's burden of proof.  For turnover, the Chapter 7 Trustee must show by a preponderance of the evidence that the property belongs to the estate and is in the

---

[24] Trustee's Ex. No. 100.
[25] Trustee's Ex. Nos. 87, 88, and 89.
[26] Debtor's Ex. Nos. 7, 8, and 9.

possession of the JME Trust.[27] It is undisputed that the assets in question are being held by the JME Trust.   The question for the Court is whether the assets constitute property of the estate.

The Chapter 7 Trustee concedes that the JME Trust was created as a valid irrevocable trust,[28] but asserts that starting in 2006 Mike exercised "complete dominion and control" over the JME Trust.   As a result of that dominion and control the Chapter 7 Trustee argues that the trust became Mike's alter ego and/or has been terminated by merger of its legal and equitable interests.[29]   Mike argues that because the Chapter 7 Trustee concedes that the JME Trust was *created* without fraudulent intent, the Court can look no further.  The Court disagrees with both.

The Court must apply Florida law in determining whether trust assets constitute property of the estate.  The Chapter 7 Trustee urges the Court to apply an alter ego reverse piercing theory with a legal merger "twist" to pierce the JME Trust.  In doing so, the Chapter 7 trustee concedes that Florida courts have not applied any alter ego type theory to irrevocable trusts but argues that the doctrine should be extended.

By the Chapter 7 Trustee's alter ego theory, creditors could disregard the trust relationship on a showing that (i) the trust is a "mere instrumentality" of the debtor, and (ii) the trust is a "device or sham to mislead creditors or exists for fraudulent purposes".[30]  This theory is most commonly applied to business entities, but some courts outside of Florida have applied it to a trust relationship.[31]  Because the Florida Trust Code (and Florida courts) are so protective of

---

[27] *In re Santaella*, 298 B.R. 793, 799-800 (Bankr. S.D. Fla 2002).

[28] Adv. Pro. 115 ECF No. 63 at 3 and 9.

[29] Adv. Pro. 115 ECF No. 63 at 18-24.

[30] *Keys Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F. Supp. 1437, 1442 (S.D. Fla. 1995), *aff'd, sub nom.*, 102 F.3d 554 (11th Cir. 1996) (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120–21 (Fla. 1984)).

[31] *E.g.*, *Limbright v. Hofmeister*, 688 F. Supp. 2d 679, 686 (E.D. Ky. 2010); *In re Gillespie*, 269 B.R. at 388–89 (Bankr. E.D. Ark. 2001); *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 510-514, 121 Cal. Rptr. 3d 118, 136–39 (2010); *Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000); *Wood v. Elling Corp.*, 572 P. 2d 755, 762 (Cal. 1977).

the sanctity of trusts, the Court doubts that the alter ego doctrine applies to irrevocable trusts and is unwilling to extend the doctrine under the circumstances presented in this case.

Generally, "[b]y establishing an irrevocable trust in favor of another, a settlor, in effect, gives her assets to the third party as a gift. Once conveyed, the assets no longer belong to the settlor and are no more subject to the claims of her creditors than if the settlor had directly transferred title to the third party".[32] The Florida Trust Code buttresses this doctrine by limiting the recovery that a settlor's creditors may seek from an irrevocable trust to only the "maximum amount that can be distributed to or for the settlor's benefit".[33]

The merger doctrine holds that "to sustain a trust entity, there must be a separation between the legal and equitable interests of the trust".[34] Merger extinguishes a trust "*only* when the legal and equitable interests are held by one person and are coextensive and commensurate-- *i.e.*, the legal estate and the equitable estate are the same".[35]

When evaluating whether the Florida Trust Code's protections from creditors apply, Florida courts look to the trust instrument itself to determine the roles and responsibilities *assigned*, rather than the roles and responsibilities *assumed*. And when evaluating whether the merger doctrine applies, Florida courts consider the actual state of legal and equitable title. As long as legal and equitable title has not been conveyed to the same person, the merger doctrine will not apply.

Giving effect to the trust instrument is of paramount concern to Florida courts. "If the trust language is unambiguous, the settlor's intent as expressed in the trust controls and the court

---

[32] *Menotte v. Brown (In re Brown)*, 303 F.3d 1261, 1270 (11th Cir. 2002).
[33] Fla. Stat. § 736.0505(1)(b) (2015).
[34] *Contella v. Contella*, 559 So. 2d 1217 (Fla. Dist. Ct. App. 1990) (citing *Axtell v. Coons* 82 Fla. 158, 89 So. 419 (1921)).
[35] *Id.* at 1219 (emphasis original).

cannot resort to extrinsic evidence".[36]    Florida law gives deference to the roles and labels assigned in trust instruments and the actual state of title to trust property.  The Florida authorities cited by the Chapter 7 Trustee support this jurisprudence.[37]

For instance, in *Miller v. Kresser*, the trial court permitted a judgment creditor to reach a beneficiary's interest in an irrevocable trust when the trustee "in perhaps the most egregious example of a trustee abdicating his responsibilities to manage and distribute property[,] * * * simply rubber-stamped [the beneficiary's] decisions and served as the legal veneer to disguise [the beneficiary's] exclusive dominion and control of the Trust assets".[38]  The trial court held that (i) the beneficiary's "exclusive dominion and control" of the trust terminated the spendthrift provision, subjecting it to the claims of the beneficiary's creditors, and (ii) the beneficiary's *de facto* control merged the legal and equitable interests, though the trial court did not terminate the trust.[39]

The district court of appeal *reversed* the trial court.  The appeals court considered first, whether the beneficiary's significant influence over the trustee and the trust constituted "express control" which would expose the assets of a spendthrift trust to creditors, and, second, whether the beneficiary's influence was sufficient to trigger merger of the equitable and legal interests.[40]

[36] *E.g., Roberts v. Sarros*, 920 So. 2d 193, 195 (Fla. Dist. Ct. App. 2006) (internal citations omitted).
[37] *E.g., Miller v. Kresser*, 34 So. 3d 172, 175-76 (Fla. Dist. Ct. App. 2010); *Contella v. Contella*, 559 So. 2d 1217, 1218–10 (Fla. Dist. Ct. App. 1990) (considering the control exercised by the beneficiary and the state of legal title); *Harvest v. Craft Const. Corp.*, 187 So. 2d 72, 74 (Fla. Dist. Ct. App. 1966) ("It is essential to the existence of any trust that the legal estate be separate from the beneficial enjoyment; and if the trustee *has the power* to use the trust corpus for his own benefit, without an accounting to the beneficiary, the equitable estate is merged in the legal estate". (emphasis supplied)).
[38] *Miller*, 34 So. 3d at 76.
[39] *See Miller*, 34 So. 3d at 174, 176.
[40] *Id.* At 175-77.

Regarding the beneficiary's dominion and control, the appeals court held that, despite the trustee's abdication of his duties, "the law requires that the focus must be on the *terms of the trust* and not the *actions of the trustee or beneficiary*".[41]  That court held:

> [t]here is no law in Florida suggesting that a beneficiary's creditors may reach trust assets in a discretionary trust simply because the trustee allows the grantor to exercise significant control over the trust.  It is only when a beneficiary has received distributions from the trust, or has the express right to receive distributions from the trust, that the creditor may reach those distributions.[42]

Because the beneficiary was not given *express* control over the trustee or the trust property--as determined by the terms of the trust--the spendthrift provision protected the beneficiary's interest from execution.[43]

Regarding merger, the appeals court held that because legal and equitable title were separate, merger did not occur.[44]  According to that court, legal and equitable title to the property must have been separate when the trust was established, with legal title in the trustee and equitable title in the beneficiary.[45]  For these interests to come together, the trustee would have had to *convey* legal title to the trust property to the beneficiary--which never happened.[46]  The interests remained separate, and merger did not occur.[47]

This Court will not deviate from the Florida courts' rigid application of statutory protections from creditors and narrow application of the merger doctrine.  Even applying the

---

[41] *Id.* at 176.
[42] *Id.* at 176.
[43] *Id.*
[44] *Id.* at 176-77.
[45] *Id.*
[46] *Id.*
[47] *Id.*

Chapter 7 Trustee's legal theories however, Mike and Ray's actions alone are not enough to allow creditors to reach the trust assets whether by merger or alter ego.

As to merger, it is undisputed that Mike is the settlor of the JME Trust and not a beneficiary. And there is no evidence that legal and equitable title of the trust and its assets are held by Mike or any other "one" person. Thus, no merger occurred.

As to alter ego, during the more than 30 years that the JME Trust has existed, Mike has purchased assets and taken loans from the Trust. In addition, Mike and Ray have ignored some of the accounting and other requirements of the trust instrument. The undisputed expert testimony (from attorney Gus Gornto, Jr.) was that "it is permissible under tax law for at trust to make a bona fide loan, properly secured, adequate interest rate, reasonable in all respects to the grantor of a trust."[48] And this is true even if the loan is made to a non-beneficiary. Gornto testified that such loans were valid investments and that "[i]t's done all the time."[49] Mike's relationship and control of the trust is insufficient to find that the trust was Mike's alter ego and does not compare to the misconduct found by the trial court in the *Miller* case which was ultimately reversed. If Mike's actions harmed anyone it was the trust beneficiaries. And if any cause of action existed it would be for those beneficiaries, not Mike's creditors. Accordingly, the Court finds in favor of the defendants on Counts I and II of the JME Trust Adversary.

By Counts III and IV of the complaint the Chapter 7 Trustee alleges that Mike "transferred to [the JME Trust] various assets of unknown value." The Chapter 7 Trustee asks the Court to determine that those transfers were fraudulent under Section 548 of the Bankruptcy Code. At trial, the only transfer made to the JME Trust in evidence and the only transfer attacked by the Chapter 7 Trustee with respect to the JME Trust was Mike's transfer (or pledge)

---

[48] Transcript at 338, Lines 2-5.
[49] Transcript at 358, Lines 2-5.

to the JME Trust of his limited partnership interest in the Brothers Mill. For the reasons set forth in the Court's discussion of the Brothers Mill Adversary below, the Court will enter a judgment in her favor of the Chapter 7 Trustee on Count IV.

The Chapter 7 Trustee presented no evidence to establish, and made no argument in her post trial brief to support Count IV (for a preference). The Court will enter judgment in favor of the defendants on Count IV.[50]

### *The Brothers Mill Adversary Proceeding*

### 1.  The Turnover Action

By Count I (and as further developed at trial), the Chapter 7 Trustee requested the turnover of $1,228,372.60, representing an alleged shareholder loan owing from the Brothers Mill to Mike.

Section 542 (b) of the Bankruptcy Code provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee..." Congress envisioned the turnover provision of Section 542 of the Bankruptcy Code to apply to money due to the debtor which is fully matured and payable on demand.[51]

The issue before the Court is therefore whether the alleged "shareholder loan is a debt and whether that debt is due. No evidence was introduced as to whether such amounts are matured and payable. The Debtors contend that the amounts transferred were capital contributions and not loans. If so, the monies are not recoverable by the Chapter 7 Trustee.

---

[50] If the evidence propounded at trial fails to address the allegations of a particular count within a complaint, the party has not met its burden of proof and the claim must fail. *In re Wolfson*, 148 B.R. 638, 645 (Bankr. M.D. Fla. 1992).

[51] *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 202-03, 103 S.Ct. 2309, 2312-13, 76 L.Ed.2d 515 (1983)).

Whether a transaction constitutes a loan rather than a capital contribution has not been discussed in the context of a turnover action.  The issue has however been analyzed in determining the allowance of claims.  In that context a creditor typically seeks to re-characterize a loan by the debtor's principal as a capital contribution and have the bankruptcy court disallow any such claim.[52]

In determining whether a transfer should be considered as a capital contribution or a loan courts consider the following non-exhaustive list of factors:

1. the names given to the instruments, if any, evidencing the indebtedness;
2. the presence or absence of a fixed maturity date and schedule of payments;
3. the presence or absence of a fixed rate of interest and interest payments;
4. the source of repayments;
5. the adequacy or inadequacy of capitalization;
6. the identity of interest between the creditor and the stockholder;
7. the security, if any, for the advances;
8. the corporation's ability to obtain financing from outside lending institutions;
9. the extent to which the advances were subordinated to the claims of outside creditors;
10. the extent to which the advances were used to acquire capital assets; and
11. the presence or absence of a sinking fund to provide repayments.[53]

And, at least one court has also considered the characterization of a transaction by the debtor in its financial statements and on income tax returns as a factor.[54]

These factors all speak to whether the transaction "appears to reflect the characteristics of ... an arm's length negotiation." This test is a fact-dependent inquiry that will vary in application from case to case.[55]

The Chapter 7 Trustee argues that the transaction is a loan because for three years the financial statements and tax returns for the Brothers Mill identified it as such.  Mike and Ray

---

[52] *See In re Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225 (4th Cir.2006); *In re Franklin Equip. Co.,* 418 B.R. 176, 190 (Bankr. E.D. Va. 2009).
[53] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726, 749–750 (6th Cir.2001).
[54] *In re Colonial Poultry Farms,* 177 B.R. 291, 300 (Bankr. W.D. Mo. 1995).
[55] *In re Dornier,* 453 F.3d at 233–34 (quoting *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749-50 (6th Cir. 2001)).

contend that doing so was simply a mistake. Eight days before trial Mike amended the tax returns accordingly. The Court admitted these amended returns into evidence over the Chapter 7 Trustee's objection. The Court concludes that the transaction was a capital contribution rather than a loan *regardless* of Mike's characterization on the Brothers Mill's original tax returns or financial statements. [56] Here, there are no loan documents and there is no evidence of a maturity date, an interest rate, a source of payment or any security for the alleged loan. In addition, the Debtors' own schedules filed in the case list no such loan. Mike's transfer of monies to the Brothers Mill is not characteristic of an arm's length negotiation, but of a limited partner's contribution to his partnership. For all of these reasons, the Court concludes that Mike's transfer of any such monies from Mike to the Brothers Mill was a capital contribution and not a debt subject to turnover under Section 542 of the Bankruptcy Code.

## 2.  The Fraudulent Transfer Actions

The Chapter 7 Trustee alleges--by the Brothers Mill Adversary--that Mike's transfer of the TEC Assets to the Brothers Mill and--by the JME Trust Adversary--that Mike's pledge of his partnership interest in the Brothers Mill to the JME Trust, should be avoided under Section 548 of the Bankruptcy Code.[57]

Under Section 548, a trustee may avoid any transfer made by the debtor within two years of the petition date if the Court finds the transfer was either actually or constructively fraudulent. It is without dispute that Mike made the transfers in question within two years of the petition

---

[56] Nine months after trial the Chapter 7 Trustee moved to supplement the record to demonstrate that Mike has still not paid the TEC Note. The Court found no authority upon which to supplement the record and denied the motion in open court. Even if the Court had allowed this additional evidence, the Court finds the fact that the TEC Note is still not paid is irrelevant.

[57] Adv. Pro. 13-115 ECF No. 63.

date.    The question before the Court is whether the transfers were actually or constructively fraudulent.

To find constructive fraud the Court must first find that the transfers were made for less than reasonably equivalent value. The evidence before the Court is insufficient to determine that no such value was given.[58]    Regardless of whether there was an exchange of reasonably equivalent value, however, the Court finds actual fraud regarding both transactions.[59]

To establish actual fraud, the Chapter 7 Trustee must prove, by a preponderance of the evidence, that the transfer was made with the actual intent to "hinder, delay, or defraud" creditors.[60]    Because actual fraud is seldom proven by direct evidence, courts may infer fraud from the surrounding circumstances of the transaction. [61]

In doing so, courts look to several "badges of fraud".    The Eleventh Circuit has adopted the following badges:

(1)    The transfer was to an insider;
(2)    The debtor retained possession or control of the property transferred after the transfer;
(3)    The transfer was disclosed or concealed;
(4)    Before the transfer was made the debtor had been sued or threatened with suit;
(5)    The transfer was of substantially all the debtor's assets;
(6)    The debtor absconded;
(7)    The debtor removed or concealed assets;

---

[58] The evidence included testimony from an estate lawyer opining that there was reasonably equivalent value because the consideration given to the Brothers Mill--the TEC Assets--was exactly what Mike received, his partnership interest in those assets. The Court agrees except for the fact that Mike immediately turned around and pledged those assets to the JME Trust. It is however, the Chapter 7 Trustee's burden to prove that the transfer was made for less than reasonably equivalent value and the Court concludes that she has not met this standard.

[59] A transfer is avoidable whether or not the debtor received reasonably equivalent value if actual intent is found. *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 629–30 (Bankr. S.D.N.Y. 2007) (collecting cases); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 793–94 (Bankr. S.D. Fla. 2000) ("In contrast to [Section 548(a)(1)(B)], which does require absence of reasonably equivalent value as an essential element of an avoidable transfer, the plain language of [Section 548(a)(1)(A)] contains no such requirement. It merely requires that the transfer be made with the requisite intent to hinder, delay or defraud creditors".)

[60] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 252 (Bankr. M.D. Fla. 2003).

[61] *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271-72 (11th Cir.1998) (internal citations omitted).

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[62]

Several of these badges are present in this case:

1.  As conceded by Mike in his post-trial brief, Mike's transfer of the TEC Assets to the Brothers Mill was a transfer to an insider. The transfer was to a partnership in which Mike is a limited partner with his brother, Ray, and the general partner is owned equally by Mike and Ray.[63] In addition, the Court concludes that Mike's transfer of his partnership interest to the JME Trust was an insider transaction.[64] Both Section 101(31) of the Bankruptcy Code and Section 726.102(8) of the Florida Statutes contain definitions of an insider. Neither statute limits a court to these definitions. The legislative history of Section 101(31) provides that "an insider is one who has a sufficiently close relationship with the debtor such that the conduct is made subject to closer scrutiny than those dealing with the debtor at arm's length." Based upon that reasoning, the Court determines that Mike's relationship to the JME Trust, as the settlor, the father of two of the beneficiaries and husband of the remaining beneficiary, designates the JME Trust as an insider.

2.  Mike retained possession and control of the TEC Assets after the transfer. After the transfer Mike held the same interest in the TEC Assets but in the form of a partnership

---

[62] *In re Levine;* 134 F.3d 1046 (11th Cir.) (adopting the same badges of fraud which are available to creditors under Section 726.105(2).

[63] *See* 11 U.S.C. § 101(31)(A).

[64] *Wiand v. Lee,* 753 F.3d 1194, 1200 (11th Cir. 2014); *See also In re Levine,* 134 F.3d 1046, 1053–54 (11th Cir.1998).

interest. Mike's control of the TEC Assets is further demonstrated by his ability to immediately transfer his partnership interest (and thus the TEC Assets) to the JME Trust.

3. Before the transfer Mike, Nancy and TEC had been sued and threatened with suit. Before the transfers litigation was pending against TEC and a third party, Walton Kinney[65] (for which Mike admitted in a letter to his attorney he was liable for "1/2 of $170,000").[66] Mike and Nancy's schedules of assets and liabilities filed in this case reflect two pending lawsuits against them--a civil suit by a homeowner's association and a foreclosure suit by Bank of America. These suits are in addition to two final judgments held by Wachovia in connection with foreclosure actions commenced in 2006. [67] In addition, by the time of the transfers Mike and Nancy had stopped making mortgage payments on two separate properties and were anticipating litigation when the transfers were made.[68]

4. The TEC Assets, by Mike's own accounting had a value of approximately $1.85 million as of July 6, 2010 (1/2 of the total).[69] The Debtors listed total assets of $1,596.981.52 on their bankruptcy schedules. The assets transferred were substantially if not all of the Debtors' assets.

5. The Debtors were insolvent at the time of the transfers. The Bankruptcy Code's definition of insolvency is essentially a balance sheet test: a debtor is insolvent when its liabilities exceed it assets based upon a market value and not distress value.[70] The computation of a debtor's assets excludes assets that may be claimed exempt by a debtor

---

[65] Trsutee's Ex. No. 93.
[66] Trustee's Ex. No. 22.
[67] Main Case ECF No. 14 at 31.
[68] Trustee's Ex. No. 22.
[69] Trustee's Ex. No. 22 at 2.
[70] 2 Collier on Bankruptcy ¶ 101.32[4] (16th Ed., 2015); See also In re Best Buy Drugs, Inc., 89 B.R. 997, 998 (Bankr. S.D. Fla. 1988).

and assets transferred that would be rendered avoidable under Section 548(a)(1)(A), fraudulent transfers done with the actual intent to hinder, delay, or defraud creditors.[71] "Where a debtor is shown to be insolvent at a date subsequent to a particular transfer and the debtor's condition did not change during the interim period, it is logical and permissible to presume that the debtor was insolvent at the time of the transfer."[72] Mike and Nancy's schedules indicate total assets in the amount of $1,596,982.52 and total liabilities in the amount of $6,908,392.20 as of the date of filing their chapter 7 petition on April 9, 2012.[73] Mike and Nancy's schedules reflect that their liabilities far exceed their assets and the Statement of Financial Affairs does not indicate that there were any significant transfers in the prior year or that there were any other significant changes in their financial condition. Accordingly, it is appropriate to presume that the Debtors were insolvent after the transfer.[74] Further, contrary to Ray's testimony that Mike was paying his debts as they became due, it is without dispute that Mike was not paying on the TEC Note, a debt at over $2 million.[75] Considering all of the evidence, the Court finds that Mike and Nancy were insolvent at the time of the transfers.

6. Mike incurred substantial debts shortly before and after the transfers as Mike concedes in his email to his attorney dated July 6, 2010. As Mike conceded in email communications with attorney Gornto and in his testimony at trial, at the time of the transfers, Mike was

---

[71] 11 U.S.C. § 101 (32); *2 Collier on Bankruptcy* ¶ 101.32[4] (16ᵗʰ Ed., 2015).

[72] *Grant v. Davis (In re Damason Constr. Corp.)*, 101 B.R. 775, 777 (Bankr. M.D. Fla. 1989).

[73] Main Case ECF No. 14 at 1.

[74] *See In re Clarkston*, 387 B.R. 882, 888 (Bankr. S.D. Fla. 2008).

[75] The TEC Note had an original due date in 2001, however, at the same time these transfers were made, TEC (through Mike and Ray) extended the note to be due on demand. The Court finds this amendment to be just part of Mike's fraudulent scheme.

liable for his portion of final judgments obtained against him as well as for delinquent and foreclosed mortgages at the time of the transfer.[76]

The presence of a single badge of fraud will only amount to suspicious circumstances. A combination of badges however, justifies a finding of fraud.[77]  Here, the combination of badges justifies a finding of fraud even absent direct proof.  And, besides these badges of fraud, this Court finds both additional circumstantial evidence *and* direct proof of Mike's actual intent to "hinder, delay or defraud" his creditors.

The parties had opposing theories on why Mike and Ray created the Brothers Mill.  Both Ray and Mike testified that the limited partnership was created to make clear which brother owned which of the TEC Assets.  The brothers testified this was necessary because Ray was going through a difficult divorce and his wife at the time asserted that Ray owned all of the TEC Assets instead of just fifty percent.  The Chapter 7 Trustee argued there was no need to clarify the ownership by creating the Brothers Mill because ownership of the TEC Assets had already been clarified in 2008 under the TEC Agreement.  Instead, the Chapter 7 Trustee argued, the real reason for establishing the Brothers Mill, (and Mike's subsequent pledge of his interest to the JME Trust) was to hinder, delay or defraud his creditors.  Based upon the evidence and the credibility of the witnesses this Court agrees with the Chapter 7 Trustee.

The evidence before the Court included numerous communications between Mike and several attorneys.[78]  In those communications, Mike expressed concerns over ongoing litigation and financial difficulties, his worsening debt and his desire to protect the TEC Assets from

---

[76] Trustee's Ex. No. 22; Transcript at 188-192.

[77] *In re Aqua Clear Technologies, Inc.*, 361 B.R. 567, 579 (Bankr. S.D. Fla. 2007).

[78] During the course of these proceedings, by agreed order, Mike waived the attorney client privilege.  This waiving is consistent with the Court's findings here regarding fraudulent intent.

creditors.[79]  Mike also voiced a desire to use the TEC Assets to pay down his debt to the JME

Trust for the benefit of himself and his beneficiaries.[80]  In doing so, however, Mike wanted to

make sure creditors could not reach the assets.  In May 2010, Mike's litigation defense attorney

(Mr. Garthe) seeks advice from an estate lawyer (Mr. MacDonald) regarding these issues.  In a

letter dated May 11, 2010, after voicing concern that he needed "to proceed as quickly as

possible" because the litigation is "nearing resolution", Mr. Garthe writes to Mr. MacDonald:

> "Ray and Mike would like to explore fully repaying the trusts with
> other personal assets **so long as** the assets are protected from the
> claims of creditors."[81]

When MacDonald informed Mike that the trust assets *were* at risk, Mike obtained another

lawyer.[82]  Mike and Ray testified that they retained another lawyer because MacDonald's fees

were too high.[83]  Based on the evidence and the credibility of the witnesses, the Court believes it

was done because MacDonald was not willing to aid in the transfers.

Mike and Ray then hired attorney Gornto.  Upon retention, Mr. Gornto created the

Brothers Mill, Mike and Ray transferred the TEC Assets into the Brothers Mill; Mike pledged

his partnership interest to the JME Trust; and then Gornto executed a UCC-1 filing to secure

Mike's debt to the JME Trust.   Just as Mike requested, the TEC Assets were transferred to the

Brothers Mill, out of the reach of creditors and then pledged to his trust and beneficiaries,

making it even more difficult for creditors to reach.

Mike's transfer of the TEC Assets to the Brothers Mill and his pledge of his interest in

the Brothers Mill to the trust were made with the actual intent to hinder, delay and defraud his

creditors.  The Court finds in favor of the Chapter 7 Trustee on Count II.

---

[79] Trustee's Ex. No. 31.
[80] Trustee's Ex. No. 31.
[81] Trustee's Ex. No. 12 (emphasis in original).
[82] Transcript at 211-215.
[83] Transcript at 499, Lines 6-16.

Further, finding in favor of the Chapter 7 Trustee on Count IV, the Court enjoins any party from the use, sale, or other disposition of the Brothers Mill's assets to the extent those assets constitute the TEC assets, pending execution of the judgment entered contemporaneously with this Opinion.

### *Conclusion*

The JME Trust is an irrevocable trust and (except for the fraudulent transfer) its assets are not property of the estate. Mike's transfer of the TEC Assets to the Brothers Mill and his pledge of his partnership interest in the Brothers Mill to the JME Trust were done with the actual intent to hinder, delay or defraud creditors. Both transfers are avoided under Section 548 and recoverable by the Chapter 7 Trustee under Section 550 of the Bankruptcy Code. The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.

DONE AND ORDERED in Orlando, Florida, on April 3rd, 2015.

CYNTHIA C. JACKSON
United States Bankruptcy Judge

The Clerk is directed to serve a copy of this Order on interested parties.